## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____          )
                                                  )
Worldwide Subsidy Group, LLC d/b/a                )
   Independent Producers Group,                  )
     132 Perry Court                           )
     San Antonio, TX   78209                   )
                                                  )
         *Plaintiff*,                    )
                                                  )
     v.                                        )
                                                  )
Carla Hayden, in her official capacity  as        )
     Librarian of Congress,                    )
     10 First St, SE                           )
     Washington, DC  20540, *and*              )
Copyright Royalty Board                           )
     PO Box 70977                              )
     Washington, DC  20024                     )
                                                  )
         *Defendants*.                   )
_____          )


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Martin Lobel (DC Bar #18960)          Brian D. Boydston, Esq.
Arthur L. Fox, II (DC Bar #058495)    Pick & Boydston, LLP
Lobel, Novins & Lamont                10786 Le Conte Ave.
1314 19th Street, NW                  Los Angeles, CA  90024
Washington, DC  20036                 (213) 624-1996 (Tel)
(202) 371-6626 (Tel)                  (213) 624-9073 (Fax)
(202) 822-1721 (Fax)                  brianb@ix.netcom.com
lobel@lnllaw.com
alfoxii@lnllaw.com

*Counsel for Plaintiff Worldwide Subsidy Group, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
Worldwide Subsidy Group, LLC dba              )
Independent Producers Group,                      )
                                                          )
                        Plaintiff,                           )
        v.                                                   )
                                                          )
Carla Hayden, in her official capacity           )
as the Librarian of Congress, and               )
the Copyright Royalty Board                       )
                                                          )
                        Defendants.                       )
_____  )

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Worldwide Subsidy Group, LLC dba Independent Producers Group ("Plaintiff", "WSG", or "IPG") by and through its attorneys, alleges upon knowledge as to its own acts, and otherwise upon information and belief, the following:

### SUMMARY OF THE ACTION

1.      This is an action whereby Plaintiff seeks redress for Defendants' abuse of discretion.  Defendants abused their discretion by imposing draconian sanctions upon Plaintiff, effectively in the amounts of $28,000,000 and $35,000,000.  The first sanction was a "discovery sanction" for failure to produce a

ten-year-old email to which the complaining party was already a firsthand recipient, which email had already been introduced into evidence by the complaining party in prior proceedings before Defendants, and which email was not responsive to discovery.  The second sanction was a sanction for the alleged perjury by a witness of Plaintiff as to the source of a particular document in Plaintiff's possession.  The second sanction was predicated on actions taken by Defendants ostensibly in the "ordinary course of official business", which predicate was never raised within the normal processes of the hearing from which the sanction issued, was never presented by a witness subject to cross-examination, was demonstrably inaccurate, and in disregard of evidence establishing that the testimony of Plaintiff's witness was truthful.

2.     The action seeks declaratory and injunctive relief against Defendants for violations of Plaintiff's rights under the Copyright Act, the Administrative Procedure Act, and the United States Constitution.  Defendants rendered determinations in a manner inconsistent with the Copyright Act, the Administrative Procedure Act, and the due process guarantees under the Fifth Amendment to the United States Constitution that precluded Plaintiff from prosecuting claims for secondary transmission royalties distributed by Defendants.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

4.      Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

5.      Plaintiff Worldwide Subsidy Group, LLC dba Independent Producers Group, is a limited liability company organized in the state of Texas.  WSG has been a participant in retransmission royalty distribution proceedings for approximately two decades, relating to retransmission royalties attributable to calendar year 1997 through the present.

6.      Defendant Carla Hayden is the Librarian of Congress (the "Librarian") and is the head of the Library of Congress.

7.      The Copyright Royalty Board ("CRB") is under the purview of the Librarian, is an entity established by a 2004 amendment to the U.S. Copyright Act, 17 U.S.C. §§ 801, *et seq*., and is comprised of three full-time Copyright Royalty Judges.  The Copyright Royalty Judges are appointed by the Librarian "after consultation with the Register of Copyrights".  17 U.S.C. §§ 801(a).  The Copyright Royalty Judges are charged with establishing rates and terms for various statutory compulsory licenses for use of certain copyrighted works, and the distribution of royalties collected in furtherance thereof.

## BACKGROUND

## A. STATUTORY AND REGULATORY BACKGROUND

### The Copyright Royalty Judges

8.     The Copyright Act grants owners of a copyright a set of exclusive rights in the copyrighted work.  See generally, 17 U.S.C. § 106.  In some circumstances, however, the Copyright Act limits the exclusivity of these rights by granting use of the copyrighted work to any person who satisfies conditions set by law, including payment of a royalty.  See 17 U.S.C. §§ 107-122.  Congress enacted the first such statutory license in 1909.  See *Recording Industry Ass'n of America v. Copyright Royalty Tribunal*, 662 F. 2d 1, 3 (D.C. Cir. 1981).

9.     Since the Copyright Act of 1976, Congress has entrusted responsibility for setting and adjusting statutory royalty rates and distributing royalty funds collected under statutory licenses to a series of administrative bodies. See *Intercollegiate Broadcast Sys., Inc. v. Copyright Royalty Board*, 571 F.3d 69, 73 (D.C. Cir. 2009); 70 Fed. Reg. 30,901 (May 31, 2005).  In 2004, Congress assigned these functions to a new panel of three Copyright Royalty Judges located within the Library of Congress.  See Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. § 801 *et seq*.).

### Royalty Distribution Proceedings

10.     Certain of the statutory licenses in the Copyright Act permit cable and satellite system operators, in exchange for a prescribed royalty, to retransmit to their subscribers over-the-air broadcasts of copyrighted material, such as broadcast television shows and feature films.  See 17 U.S.C. §§ 111, 119.  Cable and satellite system operators must deposit their royalty payments under this statutory license into a fund maintained by the Register of Copyrights pending distribution to copyright owners.  See 17 U.S.C. §§ 111(d)(1)-(2), 119(b)(1)-(3).  Each July, persons claiming royalties collected in the preceding year must file claims with the Copyright Royalty Judges.  See 17 U.S.C. §§ 111(d)(4), 119(b)(5).  A single claim may seek royalties for one or more individual television programs owned by the same copyright holder.  One of the functions of the Judges is to "accept or reject" such royalty claims "on the basis of timeliness or the failure to establish the basis for a claim."  See 17 U.S.C. § 801(b)(4).

11.     Congress also entrusted the Copyright Royalty Judges with the duty to oversee the distribution of the collected royalties to copyright owners or their agents.  See 17 U.S.C. §§ 111(d)(3)-(4); 119(b)(4)-(5); 801(b)(3).  If claimants agree on the appropriate division of the collected royalties, the Judges may find that no controversy exists about the distribution of the fees and adopt the parties' agreement "as a basis for the distribution of statutory royalty payments" to the copyright owners entitled to receive them, or their designated agent.  17 U.S.C.  §§

§§ 111(d)(4)(B); 119(b)(5)(B).  If the claimants are unable to reach a settlement, however, the Copyright Royalty Judges must determine the appropriate distribution of the royalty fund by conducting an adversarial, on-the-record "proceeding" – including discovery, motions practice, expert reports, and live testimony – according to rules set out in the Copyright Act and the Judges' regulations.  17 U.S.C.  §§ 111(d)(4)(B); 119(b)(5)(B); 803; 37 C.F.R. § 351.1 *et seq*.

12.     By regulation and long-standing practice, the Judges' "typically conduct two rounds of proceedings." *Independent Producers Group v. Library of Congress, et al., (U.S.C.A, D.C. Cir.), Case No. 13-1132*, 2014 WL 3674672, at *2; see 37 C.F.R. § 351.1(b)(2)(i)(B), (ii)(C) (describing Phase I and Phase II proceedings).  At "Phase I", the Judges "split the overall pot of money among the different categories of claimants, such as sports claimants and music claimants." *Independent Producers Group*, 2014 WL 3674672, at *2; 75 Fed. Reg. 26,798, at 26,798-99 (May 12, 2010) (describing Phase I and Phase II proceedings). Claimants typically organize themselves into "Phase I categories" by agreeing to definitions for different kinds of copyrighted content.  During "Phase II", the Judges "divide the money between the individual copyright owners within each category." *Independent Producers Group*, 2014 WL 3674672, at *2.  According to recently adopted nomenclature, and despite the continued presence of "Phase I"

7

and "Phase II" references within their regulations, the CRB now refers to "Phase I" and "Phase II" proceedings as "allocation" and "distribution" proceedings, respectively.

13.     At the conclusion of each phase of the proceeding (i.e., the "Phase I" or "allocation" proceeding, and the "Phase II" or "distribution" proceeding), absent a settlement, the Copyright Royalty Judges issue a final "determination". The "determination" sets out the Judges' findings and conclusions and either allocates (at Phase I) or distributes (at Phase II) the contested portions of the royalty fund. 17 U.S.C. §§ 111(d)(4)(B); 119(b)(5)(B).

14.     In the course of each "Phase II" or "distribution" proceeding, the CRB has adopted a two-step process. Initially, the CRB considers challenges to the claimant and program claims by adverse participants. If a claimant or program claim survives this initial review, the CRB then turns its attention to consider the most appropriate methodology by which to attribute value to the surviving claims. Royalties to the surviving claims are based on the adopted distribution methodology, or aspects thereof.

## B. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Proceedings in which Plaintiff's Claims have been dismissed.

15.     Separate royalty pools exist for cable versus satellite royalties that have been collected on a year-by-year basis, e.g., 1999 cable royalties, 1999

satellite royalties.  The Copyright Royalty Judges periodically commence proceedings simultaneously addressing multiple royalty pools.

16.     Docket No. 2012-6 CRB CD 2004-09 (Phase II) and Docket No. 2012-7 CRB SD 1999-2009 is a Phase II consolidated proceeding that was commenced by the CRB, and addresses the distribution of 2004-2009 cable royalties and 1999-2009 satellite royalties, *inter alia*, for royalties within the sports programming, devotional programming, and program suppliers categories.

17.     In the aforementioned proceeding, the CRB issued determinations regarding the validity and enforceability of claims prosecuted by Plaintiff, dismissing claims both according to the underlying owner of copyright, and according to the copyrighted works claimed by Plaintiff.  In the aforementioned proceeding, the CRB dismissed multiple claimant and program claims represented by Plaintiff on a variety of grounds that are in violation of Plaintiff's rights under the Copyright Act, the Administrative Procedure Act, and the United States Constitution.

18.     Specifically, in consolidated proceeding Docket No. 2012-6 CRB CD 2004-09 (Phase II) and Docket No. 2012-7 CRB SD 1999-2009, the CRB issued an order titled *Memorandum Opinion and Ruling on Validity and Categorization of Claims* (March 15, 2015).  See **Exhibit 1**.

**2. The Articulated Bases for Dismissal of Plaintiff's Claims.**

   **A. The $28,000,000 "Discovery Sanction" imposed on WSG's devotional programming claims in the 2004-2009 cable and 1999-2009 satellite proceedings.**

19.     In the consolidated 2004-2009 and 1999-2009 satellite proceedings, the CRB oversaw a "claims challenge" proceeding, whereby the validity and enforceability of claims prosecuted by the parties were addressed by the CRB. Following the submission of pleadings and receipt of testimony in connection with such proceeding, the CRB issued a draconian "discovery sanction" against WSG, dismissing all fifty-one (51) cable and satellite claims held by WSG-represented claimants Benny Hinn Ministries, Creflo Dollar Ministries and Kenneth Copeland Ministries.  Specifically, each such entity made claim for royalties from each of the seventeen devotional royalty pools being addressed in the consolidated proceeding, and each of those claims were dismissed.

20.     In the consolidated 2004-2009 and 1999-2009 satellite proceedings, the royalty pools attributable to the "devotional" programming category collectively included over $55,000,000 of secondary transmission royalties.  Prior to imposition of the discovery sanction, WSG had sought anywhere between 36%-53% of each cable pool, and 43%-63% of each satellite pool.  The discovery sanction imposed by the CRB gutted WSG's claim to "devotional" programming

royalties, which prior to the sanction had been a claim for approximately

$28,000,000.

21.     The discovery sanction was premised on WSG's failure to produce in

discovery *a sole 2005 email from ten years prior*, an email written by legal counsel

for Benny Hinn Ministries and Kenneth Copeland Ministries (the "David Joe

email").  Notably, the complaining party (the Settling Devotional Claimants;

"SDC") had been a *direct recipient* of the David Joe email ten years prior.  Further,

the SDC had already introduced the David Joe email into evidence in two prior

proceedings before the CRB, and in each instance there was no ruled significance

to the email.

22.     The SDC contended that the 2005 David Joe email should have been

produced in response to an SDC document request for "all correspondence"

between WSG and its represented claimants.  However, a prior ruling of the CRB

found that an SDC document request for "all correspondence" between WSG and

its represented claimants was overly broad.  In the prior ruling, the CRB therefore

limited WSG's obligation to produce documents to those documents

"contradicting" WSG's assertion of rights.  Consequently, in the consolidated

proceeding, WSG appropriately objected that the SDC's request for "all

correspondence" was overbroad, but responded that WSG would produce all

documents "contradicting" its assertion of rights, as previously required by the

CRB.  The SDC tacitly accepted WSG's objection without moving to challenge such objection.

23.     Notwithstanding, in its memorandum opinion the CRB made the novel ruling that a discovery sanction was appropriate because the subject email had been an "attempted termination" of WSG's services by Benny Hinn Ministries, Creflo Dollar Ministries and Kenneth Copeland Ministries.  The aggregate of the Judges' explanation for dismissing these fifty-one (51) claims (worth $28,000,000) was:

> "Based on IPG's failure to produce evidence in discovery in this proceeding relating to claimants' *attempted termination*(s) of IPG's agency. . . ."

**Exhibit 1** at 39 (emphasis added).

24.     WSG promptly filed a motion for reconsideration of the ruling imposing a discovery sanction and dismissing the fifty-one claims.  See **Exhibit 5**.  WSG reiterated the multiple points set forth above, all of which had already been addressed within pleadings, testimony and evidence presented to the CRB.  WSG brought to the CRB's attention that the David Joe email expressly states that it is *not* terminating the agreements between WSG and such entities, so could not be an "attempted termination".  Specifically, the David Joe email states:

> "the IPG agreements are outside their dates and *terminable*", and that IPG "should, in all candor, *expect* that the termination provisions will be invoked."

**Exh. 5**, at p.3.

25.    WSG noted that the CRB had vast evidence before them that none of the sanctioned entities had ever terminated their agreements with WSG. Specifically, WSG noted that the agreements, correspondence, recent "Acknowledgments of Representation", declarations, and deposition testimony of Creflo Dollar Ministries, Benny Hinn Ministries, and Kenneth Copeland Ministries uniformly confirmed WSG's authority in the proceedings, WSG's continued and uninterrupted representation since 1999, and WSG's continued engagement through the present.  **Exhibit 5**, at pp. 4-5.  Simply put, no basis existed to suggest that any of sanctioned entities ever terminated their agreement with WSG, or even "attempted" a termination, and all evidence referred to WSG's continued authority in these proceedings.  Therefore, the David Joe email was never construed by WSG or its represented claimants as an "attempted termination" that contradicted the existence of WSG's contractual relationships, does not appear on its face to be an "attempted termination" and, consequently, was not even subject to the SDC's discovery request that was limited to documents that "contradict" WSG's assertion that it represented the sanctioned entities.

26.    WSG further noted that the author of the David Joe email, Mr. David Joe, was not a representative of Creflo Dollar Ministries (legal or otherwise), *nor ever had been*, and therefore never had the authority to make an "attempted

termination" of the agreement between WSG and Creflo Dollar Ministries.  That

is, Mr. Joe had no more right to speak on behalf of Creflo Dollar Ministries than a

man on the street.  Consequently, even if the David Joe email were exaggerated to

be deemed an "attempted termination", which it was not, it still would not be a

document that fell within the parameters of the SDC request for documents that

"contradict" WSG's rights because, as regards Creflo Dollar Ministries, the David

Joe email was authored by an individual with no authority to terminate the

WSG/Creflo agreement.

27.    Finally, WSG reiterated that representatives of the SDC were direct

recipients of the David Joe email in 2005.  Consequently, even if the David Joe

email had been responsive to the SDC document request, which it was not, the

SDC was not prejudiced by WSG not producing the David Joe email.  The SDC

had possession of the David Joe email for nearly a decade and had submitted it in

evidence repeatedly in prior proceedings before the Judges.  According to

precedent cited by WSG, it is hornbook law that a discovery sanction could not

issue if the discovery violation resulted in no prejudice to the offended party.  In

fact, in the identical CRB opinion that imposed the discovery sanction, the CRB

had agreed with such principle in order to deny imposition of a discovery sanction

against the SDC.  **Exhibit 5**, at pp. 4-6, citing Exhibit 1, at p. 27.

28.     On April 9, 2015, the CRB denied, in pertinent part, WSG's motion

for reconsideration.  See **Exhibit 8**.  Apparently missing the point of WSG's

citation to authority requiring "prejudice" as a prerequisite for imposition of a

discovery sanction, the CRB responded "whether a receiving party is prejudiced by

a failure to produce discovery is irrelevant to the issue of a party's duty to produce

discovery."

29.     Further, ignoring WSG's observation that the David Joe email was

neither notice of termination nor an "attempted termination", the CRB held, "This

is correspondence relating to 'termination or attempted termination' of IPG as a

claimant representative."  Id. at pp. 4-5.  On such basis, the CRB held that the

David Joe email was nonetheless discoverable, despite the fact that it did not

"contradict" WSG's assertion of rights, the standard for production previously

imposed by the CRB.

30.     Finally, and only in its denial of the motion for reconsideration, the

CRB affirmed imposition of a discovery sanction on a *new* ground first raised in

the SDC's opposition to WSG's motion for reconsideration, that the David Joe

email "refers to a second of two agreements with Copeland", but that WSG had

never produced more than one agreement between WSG and Kenneth Copeland

Ministries.  The CRB's reliance on the new ground ignored that its original ruling

made no reference to such argument as a basis for the discovery sanction, and that

15

WSG therefore had no obligation to even address such irrelevant argument first raised in the SDC's opposition to WSG's motion for reconsideration.

31.     Nonetheless, WSG expressly asserted in a subsequent proceeding that WSG is unclear what "second agreement" is being referred to in the 2005 David Joe email, and has no documents to produce in connection therewith.  As such, in contrast to the CRB's April 9 2015 decision affirming its discovery sanction, in the subsequent proceeding the CRB reversed course and flatly ruled that WSG cannot be sanctioned for failing to produce the alleged "second agreement" that is not in its possession.  See **Exhibit 14** *Ruling and Order Regarding Objections to Cable and Satellite Claims* (October 23, 2017), Docket No. 14-CRB-0010-CD (2010-2013) and Docket No. 14-CRB-0011-SD (2010-2013) ("The Judges have stated in prior proceedings that '[i]t is a basic principle of discovery that a party cannot be required to produce documents that do not exist.' [citations omitted]. That principle applies here; the Judges will not sanction [WSG] for failing to produce documents that it claims do not exist when there is no sufficient evidence to indicate they do exist.").  In the initial proceeding, the SDC provided no evidence to indicate the existence of a second agreement other than an ambiguous passing reference in the David Joe email from 2005, no different than in the subsequent proceeding where the CRB adamantly refused to impose a discovery sanction.  Regardless, the "allegedly unproduced second agreement" argument was never raised until the

SDC's opposition to WSG's motion for reconsideration, and in any event was not the CRB's asserted basis for the discovery sanction, only an after-the-fact rationalization for its decision set forth in its denial of WSG's motion for reconsideration.

32.    On April 11, 2016, i.e., more than a year subsequent to the CRB's denial of WSG's motion for reconsideration of the matter, WSG filed a new motion for reconsideration based on the discovery of new evidence contradicting the CRB's holding that the David Joe email was an "attempted termination" of the agreements between WSG and its three represented claimants.  **Exhibit 9**.

33.    In its newly-filed motion for reconsideration, WSG reminded the CRB that affirmation of the discovery sanction resulted in the following statement by the CRB:

> "The topic of the email is [WSG's] continuing authority, *vel non,* to represent Devotional claimants Hinn and Dollar from and after 1999. This is correspondence relating to "termination or attempted termination" of [WSG] as a claimant representative.  [WSG] was obliged to produce the correspondence and failed to do so."

**Exhibit 9**, at p.3, citing Exhibit 8.  As reflected, the seminal issue is whether the David Joe email "related to the attempted termination" of WSG's agency.

34.    WSG represented that in the course of preparation for the production of documents in connection with the 2010-2013 cable/satellite proceedings, WSG's counsel was provided a copy of an email between Mr. David Joe and Mr.

17

Gottfried, SDC's then counsel, that followed shortly after Mr. Joe's November 2005 email that was the basis of the discovery sanction.  WSG submitted to the CRB an email string between Mr. David Joe and SDC counsel, Barry Gottfried that was initiated by SDC counsel Barry Gottfried of the law firm Pillsbury, Winthrop, et al.  The subject line reads "FW: Re: URGENT: 1999 - 2003 Cable Royalties Settlement (0183-2)".  Each email in the email string is dated December 5, 2005, shortly after Mr. Joe's November 2005 email.

35.     In relevant part, the email string states:

> **Gottfried:** "David -- Are you now telling me that [WSG]/Lisa is authorized to enter into 1999-2003 Devotional agreements without any participation by any of your clients?  (We would take this to mean that we can deal with Lisa exclusively without need for involvement or signatures by you or Marion.) . . ."

> **Joe:**  Based on the position Lisa has taken, but reserving any further objection between us and Lisa that I may voice later, again, between her and my clients, *yes, that would be what I am saying. . . .*" (emphasis added).

36.     WSG was previously unaware of these communications between the SDC and Mr. Joe.  Such document contemporaneously and unambiguously placed the David Joe email from November 2005 in context, and established that the David Joe email from November 2005 did not address, nor could be rationally characterized, as "relating to the attempted termination" of WSG's agency.  This is for the simple reason that the newly located email affirms WSG's right to represent KCM only days after the David Joe email that was the subject of the discovery

sanction, including representation pursuant to the years covered by the current proceedings.

37.     WSG noted that the SDC sought the discovery sanction imposed by the Judges, despite knowledge of the December 5, 2005 email, yet did not produce the exculpatory December 5, 2005 email.  Based on the existence of this December 5, 2005 email, and the fact that the SDC kept it a secret, to the extent that any sanction should be imposed by the CRB, WSG argued it should be issued against the SDC for its failure to produce such email to which the SDC was a party, and WSG was not.

38.     On June 1, 2016, the CRB denied the second WSG motion for reconsideration of the matter.  **Exhibit 12**.  As an initial matter, the CRB rejected WSG's argument that the December 5, 2005 email placed the David Joe email from November 2005 in context, finding that "Mr. Joe's statement could be interpreted in more than one way."  Further, and seemingly ignoring the very basis for the discovery sanction, i.e., that the David Joe email from November 2005 ostensibly reflected an "attempted termination" of WSG's representation agreement (or "related to an attempted termination", in the CRB's initial denial of the motion for reconsideration), the CRB opined "[WSG's] argument is beside the point because, whether or not the November 2005 email is correctly interpreted as

a termination or attempted termination of [WSG's] representation, [WSG] was

obligated to produce it in discovery." **Exhibit 12** ,at p. 5.

39.     Doubling down on rationalizing its discovery sanction, the CRB held:

> "Whether either party had an obligation to produce that email
> exchange is not relevant to the operative question before the Judges.
> The Judges imposed a sanction on [WSG] for failing to disclose a
> specific email in discovery. The Judges have determined that [WSG]
> was obligated to produce that email in response to any one of a
> number of the SDC's discovery requests, and that IPG failed to
> produce it. The December 2005 email exchange (and the alleged
> failure of one or the other party to produce it in discovery) has nothing
> to do with either finding."

**Exhibit 12**, at p. 7.

40.     Finally, in its June 1, 2016 denial of the motion for reconsideration,

the CRB opined that dismissal of the fifty-one (51) claims from seventeen separate

royalty pools was an "appropriate and proportionate response" to the alleged

discovery violation, because the CRB did not take the "drastic alternative" of

dismissing WSG's entire case. **Exhibit 12**, at pp. 6-7.  As noted, the discovery

sanction imposed by the CRB gutted WSG's claim to "devotional" programming

royalties, which prior to the sanction had been a claim for approximately

$28,000,000.

# # #

20

**B. The $35,000,000 sanction imposed on WSG.  The CRB's refusal to acknowledge 42 claims contained in WSG's 2008 satellite claim, and Denial of the "Presumption of Validity" of all WSG-represented claims in the 2004-2009 cable and 1999-2009 satellite proceedings.**

**i.     The "presumption of validity" sanction.**

41.     In the same claims challenge proceeding in which the aforementioned discovery sanction was issued, the CRB made another draconian sanction.  During the course of proceeding it was discovered that the attachment to the CRB's "official version" of WSG's 2008 satellite claim, which attachment lists the claimant copyright owners on whose behalf WSG was making claim, was missing particular pages.  Specifically, the ten-page attachment to WSG's 2008 satellite claim was missing pages 4, 5, 9 and 10 of the attachment, as reflected by the gaps in the numbered footer.  Consequently, the SDC and the Motion Picture Association of America ("MPAA") sought to limit WSG's 2008 satellite claim to only those claimants appearing on the remaining pages, requiring the dismissal of 42 claims of claimants that WSG asserted had appeared as part of the 2008 satellite claim attachment.  The aggregate of the SDC and MPAA argument was that a claim had not been submitted for the claimants whose names appeared on pages 4, 5, 9 and 10 of the attachment.  See *SDC's Written Rebuttal Statement On Claims*

*Issues Only* at p. 10, and the *MPAA's Written Rebuttal Statement Regarding*

*Claims Issues* at p. 37 (October 15, 2014).

42.     Notwithstanding, at the hearing on the matter, WSG representative

Raul Galaz testified that within WSG's files was a complete copy of WSG's

submission for 2008 cable and satellite royalties.  WSG produced evidence that its

submission for 2008 royalties was sent by overnight mail, and contained a cover

letter identifying the envelope's contents as *both* WSG's 2008 cable claim and

2008 satellite claim.  Notably, the attachment to WSG's 2008 cable claim was

identical in all respects to the attachment to WSG's 2008 satellite claim.  In fact,

the attachments to both the cable and satellite claims contained the header "Exhibit

A to WSG (TX) Claim for Cable/Satellite Royalties".  WSG confirmed that even

the CRB's "official version" of WSG's cable claim, which was delivered in the

same envelope, contained the entire 10-page attachment.  Mr. Galaz opined that at

some point between the filing of WSG's 2008 satellite claim and issuance of the

CRB's "official version" of such claim in September 2014, certain pages attached

to WSG's 2008 satellite claim had simply been misplaced by the CRB.  **Exhibit 13**

(WSG IPG-P-062 from claims challenge hearing)**.**

43.     WSG, however, acknowledged that during discovery it had produced

a copy of WSG's 2008 satellite claim that was missing pages 4, 5, 9 and 10 of the

attachment.  Mr. Galaz's explanation for this was simple: WSG representatives

periodically make trips to the U.S. Copyright Office and make copies of WSG's

claims and the claims of multiple other parties; WSG had produced to the SDC and

MPAA the copy of its 2008 satellite claim that it had obtained from the U.S.

Copyright Office.  Following Mr. Galaz's testimony, not a single question was

posed to Mr. Galaz regarding his testimony on this matter, i.e., no questions were

asked by the CRB judges, the SDC, or the MPAA.

44.    To WSG's shock, the CRB judges not only ruled that the 2008

satellite claims of the 42 claimants appearing on the missing pages of WSG's 2008

satellite claim would be dismissed, but the CRB accused Mr. Galaz of testifying

untruthfully regarding the source of the document that had been produced by WSG

in discovery.  To wit, the CRB asserted:

> "In the *ordinary course of official business*, upon receipt of claims
> sheets from claimants or their authorized representatives, the CRB
> inscribes on the first page of each *a hand-written sequential number*.
> The CRB inscribed the number "193" on the first page of IPG's
> satellite claim form.  *See* Ex. 302 (IPG 2008 Satellite Claim), at 1.
> However, the copy of IPG's 2008 satellite claim that IPG produced in
> discovery (and bearing IPG Bates numbers) *did not contain that
> handwritten claim number*.  *See* Ex. 603 at Bates No. IPG-0170. The
> document Mr. Galaz testified he copied from CRB files, therefore,
> could not have been copied from CRB files. The copy must have
> come from another source (most likely IPG's own records), thus
> supporting the conclusion that Mr. Galaz was trying to rebut with his
> testimony: IPG omitted the missing pages from its filing with the
> CRB.
>
> Mr. Galaz did not testify truthfully when he stated that he obtained the
> copy of the claim with missing pages that IPG produced in discovery
> from the CRB records."

**Exhibit 1**, at p. 8 (emphasis added).

45.     Consequently, and as another draconian sanction, the CRB ruled that all claims asserted by WSG on behalf of any party, and any program claims asserted by WSG for any of the seventeen royalty pools addressed by the proceeding, would be denied the "presumption of validity" afforded to all other claimants.  **Exhibit 1**, at pp. 7-10.  Among other matters, denying a party the "presumption of validity" dramatically shifts the burden of rights validation and, as demonstrated by the CRB's actions, in the event that there are conflicting claims to programs, the party retaining the "presumption of validity" will be awarded the program royalties.

46.     The CRB sanction denying WSG the "presumption of validity" was secondarily asserted based on the appearance of a single claimant, Tracee Productions", on WSG's filing for 1999 satellite royalties that was made in July 2000.  **Exhibit 1**, at pp. 9-10.  WSG maintained in the 1998-1999 cable proceeding that the appearance of "Tracee Productions" on WSG's 1999 cable claim was legitimate, and presented evidence that Tracee Productions was an entity legitimately organized in Los Angeles County, California.

47.     Both in the 1998-1999 cable proceeding, and the consolidated 2004-2009 cable and 1999-2009 satellite proceeding, the CRB refused to accept WSG's contention because Tracee Productions had admittedly been involved in the

fraudulent collection of royalties attributable to calendar years 1994-1996.

Regardless, WSG contended that the issue of "Tracee Productions" was moot

because in direct testimony, and in literally scores of claims and pleadings filed

since July 2000, i.e., over the prior fifteen years, WSG had never once sought the

collection of royalties on behalf of Tracee Productions, and had expressly

represented to the CRB in sworn testimony that it made no claim on behalf of

Tracee Productions.  Despite WSG's frequent and unqualified representations

since July 2000 that it does not make claim for and does not represent Tracee

Productions, the CRB maintained that WSG *should* have filed an amendment to its

1999 satellite claim in order to remove Tracee Productions from such filing,

whereas WSG maintained that such form-over-substance amendment was pointless

in light of the multiple subsequent filings relating to 1999 satellite royalties in

which WSG had omitted any assertion of a claim on behalf of Tracee Productions,

and WSG had already expressly testified that no claim was being made on Tracee

Productions' behalf.  No explanation was provided why the appearance of Tracee

Productions' on WSG's 1999 satellite claim should affect any of the other twenty-

seven (27) cable and satellite claims filed by WSG from 2000 through 2009 that

did not identify Tracee Productions as a WSG-represented claimant.

48.    As with the discovery sanction addressed previously, WSG

immediately filed a motion for reconsideration of the CRB's ruling.  Therein,

WSG noted that assertion of the CRB's "ordinary course of official business" had never been raised prior to the proceeding or during the proceeding, so WSG had no reason or opportunity to address the validity of such assertion.  More significantly, however, review of documents already in WSG's possession established that the predicate of the CRB's accusation of perjury, i.e., that "in the ordinary course of official business, upon receipt of claims sheets from claimants or their authorized representatives, the CRB inscribes on the first page of each a hand-written sequential number" – *was demonstrably inaccurate.*  See **Exhibits 2, 4.**

49.    WSG proved that the CRB had not followed the asserted "ordinary course of business" either for 2008 royalty filings, or for multiple other years.  In fact, on *multiple* prior occasions the CRB had *lost entire claims* filed by WSG, and had *lost entire claims* filed by other parties, only for the claims to be subsequently accepted and recognized when evidence of the claims had been presented.  **Exhibit 2**, at pp. 11-12, citing *SDC Motion to Amend Joint Petition to Participate*, Docket no. 14-CRB-0008-SD (2010-2012), filed Feb. 10, 2015, and *MPAA Motion to Amend MPAA List of Represented Claimants for 2011 Satellite*, Docket no. 14-CRB-0008-SD (2010-2012), filed Feb. 5, 2015.  Notably, the CRB had previously lost WSG's 2004 satellite claim #327 and WSG's 2011 satellite claim.  Therefore, it obviously was not inconceivable over the course of six years for the CRB to have misplaced a handful of pages from a single claim filed by WSG.

50.     WSG's review of the CRB's ostensible "ordinary course of business in the receipt of claims" began with a comparison of WSG claims that had been obtained from the CRB and the CRB's "official version" of those claims. WSG then broadened its search by traveling to Washington, D.C. to review all claims in the possession of the CRB, but was necessarily limited to the extent that it had no basis for comparing claims of third parties in the possession of the CRB with copies received by such parties from the CRB. Relevant to the foregoing is that WSG was not afforded access to the CRB files until March 27, 2015, i.e., following WSG's filing of its motion for reconsideration. After WSG's review of the CRB files, even more evidence disproving the CRB's predicate for its finding was discovered, and was thereafter first detailed in WSG's reply brief in support of its motion for reconsideration. See **Exhibit 4**.

51.     Specifically, WSG was able to confirm the following:

-     In the 2008 satellite filings, of the 237 claims filed, a hand-written sequential number only appeared on claim numbers 176, 193 (WSG claim), 194, and 220-237. All other claims contained a bate-stamp number. No explanation has been provided why WSG's claim was marked differently. **Exhibit 4** (IPG reply), Decl. of R. Galaz.

-     In the 2008 satellite filings, of the few claims that contained a hand-written number, the number appeared in original ink. WSG's claim – *and only WSG's claim* – contained a hand-written number that was a photocopy, and further appeared on paper that was significantly lighter than all other paper in the files, i.e., had not been aged as long. Such facts reflect a second-generation copy, and no fewer than three versions of WSG's 2008 satellite claim in the possession of the CRB. **Exhibit 4** (IPG reply), Decl. of R. Galaz.

- Handwritten numbers are often placed on claims by the CRB long *subsequent* to the CRB's receipt thereof, and *after* such claims are offered to the public for photocopying.  WSG produced several copies of WSG's own claims in which versions copied at the Copyright Office have no hand-written or bate-stamp number, but nonetheless reflect other CRB notations, only for a number to later appear in the CRB "official version" thereof.  *Cf.* WSG's 2004 cable and satellite claims (**Exhibit 2**, at Exhibits 7, 9, 11, 13) *with* CRB "official version" of WSG's 2004 cable and satellite claims (**Exhibit 2**, at Exhibits 8, 10, 12, 14).

- CRB personnel simultaneously maintain multiple versions of the identical claim.  WSG demonstrated that it has multiple versions of the same WSG claim, all of which were received from the CRB and reflect extensive CRB personnel notations, but which CRB notations are *different and differently placed* than the "official" version.  See, e.g., WSG's 2005 cable claim.  *Cf.* WSG's 2005 cable claim (**Exhibit 2**, at Exhibit 15) *with* CRB "official version" of WSG's 2005 cable claim (**Exhibit 2**, at Exhibit 16).

- In the instant proceeding, the CRB provided different "official versions" of claims.  On September 19, 2014, the CRB provided the MPAA an official version of WSG's 2004 cable claim.  Such version differed significantly from a version previously obtained by WSG from the CRB, and contained extensive handwritten markings.  Then on November 13, 2014, the CRB provided WSG by email an entirely different version of WSG's 2004 cable claim unlike that previously obtained by WSG, and which contained none of the extensive markings appearing on the "official version" that was produced to the MPAA eight weeks earlier.  (**Exhibit 2**, *Cf.* Exhibits 15, 16, and 17).

- Issues abound regarding the integrity of maintenance of the claims provided by the CRB to the public for photocopying.  Upon request for access to the claims, boxes containing the claims are sent to the Copyright Office Licensing Division reading room.  No CRB personnel are present for oversight, yet the files provided for copying have historically included claims stamped "original", and appear to be the original claims.  The CRB does not assure that the "original"

claims it provides for public review are returned in the same state as
were provided.  **Exhibit 4** (IPG reply), Decl. of R. Galaz.

- The CRB retains multiple sets of the filed claims.  During WSG's
  review of claims at the CRB, certain claims made accessible to WSG
  were stamped "original", while others were stamped "copy". At
  minimum, such fact raises the possibility that the documents made
  available for photocopying at the Copyright Office differ from the
  "official" version of such claims.  **Exhibit 4**.

- CRB personnel sometimes inscribe a "hand-written sequential
  number" on claims, and sometimes utilize a bate-stamp number on
  claims, even for filings to the same royalty pool.  Among numerous
  examples, the 2008 satellite claims available for review at the
  Copyright Office reflected both hand-written and bate-stamp numbers,
  but not both.  The CRB's "official version" of WSG's 2008 satellite
  claim had a hand-written number, while WSG's 2008 cable claim had
  a bate-stamp number.  **Exhibit 4**.

- CRB personnel sometimes fail to *either* inscribe a "hand-written
  sequential number" or to utilize a bate-stamp number on claims prior
  to such claims being made available to the public for review and
  photocopying.  **Exhibit 2**.

52.    WSG is a veteran of the royalty distribution proceedings, having

participated in them for almost two decades.  All veterans to the distribution

proceedings are aware of the strict consequences for a claimant's failure to comply

with the filing requirements for July claims.  *See Universal City Studios LLP v.

Peters* 402 F.3d 1238, 1241, (D.C. Cir. 2005).  Because of such consequences, IPG

has been extraordinarily careful regarding its July claims filings, yet such fact has

*still* not precluded prior demonstrable errors on the part of the CRB, which

apparently include multiple instances in which a submitted claim has been lost or temporarily misplaced.

53.     Given the wealth of evidence demonstrating the inaccuracy of the CRB's predicate for alleging that Raul Galaz testified falsely, WSG posed the issue in the following manner:  which possibility is more likely: (i) IPG filed a satellite claim with missing exhibit pages when its cable claim arrived at the CRB in the *same* package, with the *identical* exhibit containing all of the pages 1-10, or (ii) during the intake of hundreds of claims by the CRB proximate to July 2009, or during the course of several years thereafter, or during the photocopying of IPG's 2008 satellite claim by CRB personnel and the public, a portion of IPG's exhibit was mislaid.

54.     IPG had in its possession a copy of the entire contents of the package that was delivered to the CRB containing WSG's 2008 cable and satellite claims, and such document was admitted into evidence at the preliminary hearing as Exhibit IPG-P-062.  The exhibit contained the cover letter that accompanied IPG's 2008 cable and satellite claims, and the entirety of the exhibits attached to such claims.  No different than with the Judges' determination that Raul Galaz testified untruthfully about the source of a particular version of the claim in his possession, the Judges should logically have concluded that Exhibit IPG-P-062 did not actually exist and was fabricated, as there is no other explanation for the differences

between IPG's 2008 satellite claim appearing as IPG-P-062 (which is complete), and the CRB's "official version" of such claim now appearing in the CRB's records (which is incomplete).

55.    On April 9, 2015, the CRB denied, in pertinent part, WSG's motion for reconsideration.  See **Exhibit 8**.  The CRB rejected WSG's arguments, noting that *some* form of numbering of claims always occurs during their intake, whether hand-written or bate-stamped, and so the presence of hand-written numbering versus bate-stamp numbering was insignificant, regardless of the possible reasons for the discrepancy, and regardless that only a handful of the 2008 satellite claims were markedly different in appearance.

56.    In distinguishing WSG's 2004 claims obtained from the CRB which reflected neither a hand-written or bate-stamp number, in a footnote to its denial of WSG's motion the CRB asserted that claims "prior to 2005" were filed with the Copyright Office, and not the CRB, and are therefore "irrelevant".  **Exhibit 8**, at fn. 1.  The CRB's assertion is based on its incorrect contention that WSG's observations relate to records pre-dating the 2004 creation of the CRB, a position reiterated in the CRB's denial of WSG's motion for reconsideration.  Id. at p. 3. However, WSG's 2004 claims were filed in July 2005 *with the CRB*, and WSG's cover letter containing such claims was addressed to the "Copyright Royalty Board, P.O. Box 70977, Southwest Station, Washington, D.C. 20024", *no*

*differently than any and all claims filed with the CRB through the present*.  **Exhibit 13**.  As evident error on its part, the CRB misrepresented that 2004 claims were not filed with the CRB.  The CRB also ignored that, regardless of whether the claims intake procedure was technically overseen by the CRB versus its predecessor, the identical individuals as were staffed to man the CRB's intake of claims, manned the intake of claims by the CRB's immediate predecessor.

57.    The CRB's denial of WSG's motion for reconsideration altogether failed to address the fact that the CRB's staff, during the CRB's tenure, have *lost entire claims* filed by WSG, and have *lost entire claims* filed by other parties, only for the claims to be subsequently accepted and recognized when evidence of the claims has been presented to the CRB.

58.    Ironically, WSG has now discerned *additional e*vidence establishing that Raul Galaz testified truthfully regarding the source of the WSG 2008 satellite claim produced in discovery.  Specifically, Exhibit 1 to WSG's motion for reconsideration was the version produced in discovery that Raul Galaz testified he obtained only after photocopying at the CRB's office, i.e., the photocopy with missing pages.  **Exhibit 2**, at Exhibit 1.  Nevertheless, the CRB alleged that such document had not been obtained by WSG from the CRB's offices, but was rather a copy of the original taken from WSG's files.  Upon further review, WSG now observes that several pages of Exhibit 1 reflect the photocopy shadowing of a

three-hole punch.  The contents of WSG's submission for 2008 royalties was only twenty-five pages – a cover letter (1 page), the 2008 cable claim with attachment (twelve pages), and the 2008 satellite claim with attachment (twelve pages).  WSG does not, nor ever has, submitted its July claim filings in a three-hole binder, nor would submission of a twenty-five page document warrant a three-hole binder.  As such, the only rational explanation for the three-hole shadowing is that the photocopy produced by WSG in discovery (**Exhibit 2**, at Exhibit 1) was a photocopy taken after WSG submitted its claim to the CRB, and after WSG's 2008 satellite claim was placed in a three-hole binder.  WSG observes that many of the claims filings made available to the public for photocopying by the CRB are collectively provided in three-hole binders.

> ii.     **The practical and monetary effect of the "presumption of validity sanction.**

59.    The significance of denying WSG the "presumption of validity" is that the MPAA made claim to the vast majority of programs claimed by WSG, and so the MPAA was automatically awarded the royalties to the conflicting program claims.  This occurred despite the fact that WSG was required by the CRB to present proof of its contractual engagement with underlying copyright owners, and then prove the copyright owner's entitlement to the programs for which they were making claim.  By contrast, the CRB invoked no similar requirement upon the

MPAA.  Specifically, the overwhelming percentage of the MPAA's program claims were claimed by "agents" of the ostensible copyright owners, not the actual copyright owners.

60.    While WSG was required to present a heightened level of documentation as a result of its loss of the "presumption of validity", the CRB refused to require the MPAA to even produce copies of the agreements between the "agents" and the ostensible copyright owners that the agents (and, ergo, the MPAA) purported to represent.  Consequently, while IPG was required to present the entire chain-of-title to its claimed programs, the chain-of-title for any MPAA-claimed program was presumed to be valid, even if there was no evidence that the MPAA-represented agents had actually been engaged by the purported copyright owner, and without any submission of evidence verifying an entity's ownership of a claimed program.  The net effect was that the MPAA's program claims, no matter how unsubstantiated, remained intact, while WSG's claims were decimated, and trumped in each instance in which a conflicting program claim existed.

61.    Absent analysis that cannot occur without additional documentation received from the MPAA, WSG can only speculate as to the full monetary effect of the CRB's denial of the "presumption of validity" to WSG, and the CRB's inequitable requirements of documentation from WSG versus the MPAA. Notwithstanding, even according to the values attributed by the MPAA, the

resulting royalties to which WSG has been denied equals no less than $35,000,000, a figure based on the values attributed to WSG programming by the MPAA prior to imposition of the CRB sanction, versus the values resulting following imposition of such sanction.

## PLAINTIFF'S CLAIMS FOR RELIEF

### COUNT 1
Violation of the Copyright Act and Administrative Procedure Act
(17 U.S.C. §§ 111, 119; 5 U.S.C. §§ 701-706)

62.     Plaintiff repeats and realleges by reference all preceding allegations.

63.     On the basis of the facts alleged above and for such further reasons as Plaintiff may prove at or before trial, Plaintiff alleges that Defendants have violated the Copyright Act, 17 U.S.C. §§ 111, 119, and the Administrative Procedure Act, 5 U.S.C. §§ 706, by making determinations that are (a) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (b) contrary to Plaintiff's constitutional rights, powers, privileges, and immunities; (c) in excess of Defendants' statutory jurisdiction, authority, limitations, and rights, and (d) without substantial evidence or factual basis.

64.     Among other matters, Defendants have abused their discretion by imposing draconian sanctions, beyond the authority of Defendants to impose and not in accordance with the law; have made incorrect factual assumptions without substantial evidence; have arbitrarily ignored evidence dispositively establishing

the fallacy of Defendants' determinations; and dismissed claims to U.S. cable and satellite secondary royalties to which Plaintiff was entitled to collect.

## COUNT 2
### Denial of Due Process of Law (U.S. Constitution, Amend. V)

65.    Plaintiff repeats and realleges by reference all preceding allegations.

66.    On the basis of the facts alleged above and for such further reasons as Plaintiff may prove at or before trial, Plaintiff alleges that Defendants have deprived Plaintiff of due process of law, as guaranteed by the Fifth Amendment to the United States Constitution.

67.    Among other matters, Defendants have imposed draconian sactions, beyond the authority of Defendants to impose and not in accordance with the law; have made incorrect factual assumptions without substantial evidence; have arbitrarily ignored evidence dispositively establishing the fallacy of Defendants' determinations; and dismissed claims to U.S. cable and satellite secondary royalties to which Plaintiff was entitled to collect.  These actions deprived Plaintiff of a fair, meaningful opportunity to be heard, and violate due process of law as guaranteed by the Fifth Amendment to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Worldwide Subsidy Group LLC dba Independent Producers Group, prays for relief and a judgment against Defendant Carla Hayden,

in her official capacity as the Librarian of Congress, and Defendant Copyright Royalty Board, as follows:

(1) declaring that Defendants are violating the Copyright Act, the Administrative Procedure Act, and the United States Constitution;

(2) directing Defendants to set aside the final agency action of the Copyright Royalty Board, and to find that the fifty-one (51) cable and satellite claims held by WSG-represented claimants Benny Hinn Ministries, Creflo Dollar Ministries and Kenneth Copeland Ministries, in Copyright Royalty Board Docket No. 2012-6 CRB CD 2004-09 (Phase II) and Docket No. 2012-7 CRB SD 1999-2009, are reinstated and no longer dismissed;

(3) directing Defendants to set aside the final agency action of the Copyright Royalty Board, and to find that the forty-two claims of claimants appearing on Plaintiff's 2008 satellite claim are reinstated and no longer dismissed;

(4) directing Defendants to set aside the final agency action of the Copyright Royalty Board, and to reinstate to WSG the "presumption of validity" for its represented claims;

(5) remanding Copyright Royalty Board Docket No. 2012-6 CRB CD 2004-09 (Phase II) and Docket No. 2012-7 CRB SD 1999-2009, for the issuance of findings consistent with the foregoing;

(6) retaining jurisdiction of this matter until Defendants have fulfilled all of their statutory, regulatory, and Court-ordered obligations;

(7) awarding Plaintiff, as appropriate, their costs, attorneys' fees, and other disbursements for this action; and

(8) granting Plaintiff such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: December 8, 2017

_____/s/_____
Brian D. Boydston, Esq.
California State Bar No. 155614

PICK & BOYDSTON, LLP
10786 Le Conte Ave.
Los Angeles, California 90024
Telephone:  (213) 624-1996
Facsimile:   (213) 624-9073
Email: brianb@ix.netcom.com

_____/s/_____
Martin Lobel, Esq.  (DC Bar # 18960)

_____/s/_____
Arthur L. Fox, II   (DC Bar # 058495)
LOBEL, NOVINS & LAMONT, LLP
1314 19th Street, NW
Washington, DC  20036
Telephone:  (202) 371-6626
Facsimile:   (202) 822-1721
Email: lobel@lnllaw.com
            alfoxii@lnllaw.com

*Attorneys for Worldwide Subsidy Group, LLC*

# **EXHIBITS**

Exhibit 1:  *Memorandum Opinion on Validity and Categorization of Claims* (March 15, 2015), Docket No. 2012-6 CRB CD 2004-09 (Phase II) and Docket No. 2012-7 CRB SD 1999-2009.

Exhibit 2:  *IPG [First] Motion for Modification of the March 13, 2015 Order* (March 17, 2015).

Exhibit 3:  *Joint Opposition to Independent Producers Group's [First] Motion for Modification of the March 13, 2015 Order* (March 25, 2015).

Exhibit 4:  *IPG Reply in support of [First] Motion for Modification of the March 13, 2015 Order* (March 31, 2015).

Exhibit 5:  *IPG Second Motion for Modification of the March 13, 2015 Order* (March 20, 2015).

Exhibit 6:  *SDC Opposition to IPG Second Motion for Modification of the March 13, 2015 Order* (March 27, 2015).

Exhibit 7:  *IPG Reply in support of Second Motion for Modification of the March 13, 2015 Order* (April 1, 2015).

Exhibit 8:  *Order on IPG Motions for Modification* (April 9, 2015).

Exhibit 9:  *IPG Third Motion for Modification of the March 13, 2015 Order* (April 11, 2016).

Exhibit 10:  *SDC Opposition to IPG Third Motion for Modification of the March 13, 2015 Order* (April 22, 2016).

Exhibit 11:  *IPG Reply in support of Third Motion for Modification of the March 13, 2015 Order* (May 2, 2016).

Exhibit 12:  *Order Denying IPG's Third Motion for Modification* of the March 13, 2015 Order (June 1, 2016).

Exhibit 13: WSG Exhibit IPG-P-062 from claims challenge hearing.

Exhibit 14: *Ruling and Order Regarding Objections to Cable and Satellite Claims* (October 23, 2017), Docket No. 14-CRB-0010-CD (2010-2013) and Docket No. 14-CRB-0011-SD (2010-2013).